C. S. Chapman and Alice E. Chapman v. Commissioner. Irvin C. Chapman v. Commissioner. Zelda M. Chapman v. Commissioner. Virginia Trustees, Ltd. v. Commissioner. Irvin Trustees, Ltd. v. Commissioner. Transcounties Corporation v. Commissioner.
C. S. Chapman & Alice E. Chapman v. Commissioner
Docket Nos. 9495, 9496, 9497, 9498, 9499, 9500.
United States Tax Court
1948 Tax Ct. Memo LEXIS 244; 7 T.C.M. (CCH) 88; T.C.M. (RIA) 48028; February 26, 1948
*244 George G. Witter, Esq., 453 So. Spring St., Los Angeles, Calif., and Verne H. Wright, C.P.A., 756 So. Broadway, Los Angeles, Calif., for the petitioners. E. A. Tonjes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: These proceedings were brought for a redetermination of deficiencies in corporation declared value excess-profits tax, and corporation and individual income tax for the year 1940 as follows: Transcounties Corporation (declared
value excess-profits)
$ 9,119.74
Transcounties Corporation (income)
22,908.12
C. S. and Alice M. Chapman
12,816.35
Irvin C. Chapman
53.71
Zelda M. Chapman
374.54
Virginia Trustees, Ltd.
1,015.64
Irvin Trustees, Ltd.
1,000.04
The proceedings were consolidated for hearing and decision. An initial question is whether a sale of property occurred in 1940 or 1941, the transaction being consummated by means of escrow arrangements. Further issues are whether gain on the sale of corporate assets is attributable to the corporation or its stockholders; whether the corporation realized taxable gain upon a distribution of a dividend in kind during the year 1940; and whether *245 the stockholders received a taxable dividend in the year 1940. Findings of Fact Transcounties Corporation (hereinafter sometimes called "Transcounties") is a California corporation. The other petitioners are stockholders of Transcounties. The returns for the period involved were filed with the collector of internal revenue for the sixth district of California. Transcounties kept its books and filed its returns on an accural method of accounting. The capital stock of Transcounties was owned principally by members of the Chapman family during the year 1940 as follows: Stockholder
Shares
Charles C. Chapman Co.
2,676
Virginia Trustees, Ltd.
1,145
Irvin Trustees, Ltd.
1,135
C. S. Chapman
2,891
Alice Allen Chapman
2,150
Clara I. Chapman
154
Irvin C. Chapman
181
Zelda Chapman
623
Sam L. Collins
10
Total Shares
10,965
For some years prior to 1940 Transcounties owned, along with other properties, a parcel of real estate located in Tulare County, California, which was developed as a citrus grove. This property will sometimes hereinafter be referred to as the "Lindsay Ranch." It was about 200 miles from Fullerton. Transcounties also owned the "El *246 Dorado Ranch," which was within the city limits of Fullerton. It consisted of 100 acres, 60 of which were devoted to citrus groves. In 1940 this ranch was regarded as suitable for subdivision into city lots. About the year 1935 Transcounties entered into an arrangement with a corporation known as Stark and Waddell Packing Corp., which was in the citrus production and packing business, whereby the latter managed the Lindsay Ranch, advanced money for operating expenses, handled the fruit, sold it and, after reimbursing itself and making a fixed charge for supervision, turned the remainder over to Transcounties. This arangement continued until the property was acquired by Stark and Waddell, Inc. Transcounties was indebted to the Security First National Bank of Los Angeles on a note in the sum of $335,000, dated February 16, 1938. The indebtedness was secured by a blanket mortgage on the Lindsay Ranch, the El Dorado Ranch, and a note for $60,000 in favor of Transcounties signed by Charles C. and S. J. Chapman. Early in 1940 the stockholders of Transcounties desired to sell the Lindsay Ranch for sufficient to clear the blanket mortgage and then subdivide and sell the El Dorado Ranch. *247 Sometime early in the year 1940 negotiations were opened, looking toward the acquisition of the Lindsay Ranch by Stark and Waddell Packing Corporation. In the negotiations Richard A. Stark represented Stark and Waddell Packing Corporation; Irvin Chapman and C. S. Chapman represented Transcounties, and Gerald S. Toll represented the mortgage holder, Security First National Bank of Los Angeles. In view of the fact that the Lindsay Ranch, the El Dorado Ranch and the $60,000 note payable to Transcounties were all collateral for the $335,000 mortgage note, the matter of an arrangement satisfactory to all parties for the sale of the Lindsay Ranch presented several difficulties. One difficulty in particular was to work out a guarantee by Transcounties which would be satisfactory to the mortgage holder, Security First National Bank, for the reason that Transcounties was already liable on the mortgage note and the bank wanted to preserve its liability. Negotiations commenced early in the year 1940. There were times when it appeared that it might be difficult to reach an agreement whereby Stark & Waddell, Inc., could purchase the property, due to the many legal and financial problems *248 involved. On July 22, 1940, Transcounties and Stark and Waddell executed an extension of their working agreement for three years, providing for its termination in the event of sale. Petitioners received a letter from Stark and Waddell late in August of 1940 which they took to mean that the bank and Stark and Waddell could not come to an agreement and that the sale was no longer possible. The letter in part stated: "Mr. Toll says he understood us to agree that we would make certain principal payment guarantees, it was never our intention to convey such thought to Mr. Toll. In our discussions we agreed and it was intended that our present corporation should guarantee production cost, taxes, and interest, but we don't feel we should make any guarantee of certain principal payments. "We are sorry that a misunderstanding has developed and Mr. Toll has advised us that they will be unable to negotiate further on the basis we have previously discussed the matter. We will be glad, of course, to further discuss the matter with the bank and trust that some workable proposition can be worked out. Will keep you advised." Thereupon other brokers were consulted. Some time prior to November 25, 1940, the *249 parties reached an agreement to the effect that the Lindsay Ranch was to be sold to Stark and Waddell, Inc., for $300,000. It was agreed that the Security First National Bank of Los Angeles was to act as escrow holder in the consummation of the sale. Pursuant thereto escrow instructions were prepared by the parties to the transaction, viz., the buyer, the seller, and the mortgage holder. It was also arranged to have title taken in the name of Stark and Waddell, Inc. The purpose of the escrow arrangements was to effect the solution of the various problems attending the sale and to pass title to the property to Stark and Waddell, Inc., which was organized for that purpose. No formal agreement in writing to buy and sell was entered into by the parties at any time, other than the escrow instructions. On November 25, 1940, escrow instructions were signed, one escrow being numbered 50-39221-D; another, a loan escrow on behalf of the buyer, numbered 50-39222-D; and another, a loan escrow on behalf of the seller, numbered 50-39223-D. On December 9, 1940, Escrow 50-39221-D was modified and supplemented by the buyer in certain particulars. Escrow 50-39223-D was supplemented by "Additional *250 Escrow Instructions," dated December 31, 1940, and signed by the seller. The escrows called for numerous acts to be performed, documents to be furnished, assignments, and mortgages to be made, and accounts between buyer and seller to be agreed upon. Escrow 50-39221-D provided for a deposit by the buyer of $20,000 cash, plus the proceeds of a loan by the bank in the sum of $280,000, for which the buyer was to be furnished a policy of title insurance showing the property vested in the buyer free and clear of any existing mortgage. Escrow 50-39222-D was the loan escrow on behalf of the buyer and called, among other things, for the deposit of an independent guarantee of the buyer's obligations by the Stark and Waddell Packing Corporation (not the buyer). Escrow 50-39223-D was the loan escrow on behalf of the seller, calling for the deposit of the note of the seller for $40,000 to be secured by certain assignments, pledges, mortgages, trust deeds, loan and collateral agreement, and "In addition to the above there are additional instructions, as set forth relative to additional collateral. Such instructions are considered to have been incorporated and made a part of the entire transaction *251 covered by these instructions." Each of the above escrows, by express language, was made contingent upon all of the other escrows. The buyer, Stark and Waddell, Inc., delivered all of the items it was to place in the possession of the escrow holder prior to December 9, 1940. The seller placed all the items which were required to be deposited with the escrow holder on December 9, 1940, with the exception of the $40,000 guarantee note required by the mortgage holder occasioned by the fact that the agreed purchase price was $300,000, whereas the mortgage and accrued interest amounted to $340,000. Everything the bank, the mortgager, was required to deposit was placed in the hands of the escrow holder by November 19, 1940. On December 18, 1940, E. M. Davis, Manager, Escrow Department of the Security First National Bank of Los Angeles, addressed the following letter to Charles S. Chapman and Irvin C. Chapman Fullerton, California: "Gentlemen: "We are enclosing for the Transcounties Corporation the General Continuing Guarantee which was discussed at our previous meeting, and we have now secured the property forms for execution. You will note that the Continuing Guarantee is limited *252 to $50,000.00 and does not mention the encumbrance of Charles S. and S. J. Chapman Company. "Please execute one copy and retain the other copy for your files. We will require a resolution from the Board of Directors of the Transcounties Corporation authorizing the execution of the enclosed Guarantee. "Your prompt attention will be appreciated." Upon consideration of the terms of the guarantee note, transmitted with the letter of December 18, 1940, it was decided that the terms were not acceptable. C. S. Chapman conveyed the refusal of the Board of Directors of Transcounties to execute the guarantee to Toll at the bank and they endeavored to work out something that would be satisfactory to the bank and Transcounties. As a result of the discussion between C. S. Chapman and Toll, the latter agreed to prepare and send a form of guarantee to conform to their discussion. It was to make Transcounties' liability apply only to installments as they were due, and in the event of foreclosure, to a deficiency remaining after liquidation of the security. C. S. Chapman gave a general indication that he thought it would receive favorable consideration from the other directors of the corporation. *253 C. S. Chapman was not represented as having authority to bind Transcounties. The loan department of the bank, on December 28, 1940, sent instructions to the legal department to draw up a form of guarantee. The form prepared by the bank date the instrument "January -, 1941." The instruments containing the revised provisions were mailed to either the Chapmans or Transcounties on December 31, 1940. The "Additional Escrow Instructions," dated December 31, 1940, directed to the Bank, signed by C.S. and Irvin Chapman were on behalf of Transcounties and as trustees of the El Dorado Trust, and contained the following provisions: "My previous instructions in the above numbered escrow are hereby modified - supplemented in the following particulars only: "The undersigned hands you herewith or cause to be handed you herewith executed Guaranty of the Transcounties Corporation of that certain note in the amount of $40,000.00 in favor of Security-First National Bank of Los Angeles, dated November 15, 1940 and mentioned in said Guaranty, and a Resolution of the Board of Directors of said Transcounties Corporation authorizing the execution and delivery thereof to the Security-First National *254 Bank of Los Angeles to be held by them in connection with the loan in their favor herein mentioned. At the close of this escrow you will deliver said Guaranty with the other documents pertaining to the loan to the Head Office Loan Department without consideration to the undersigned Transcounties Corporation." The resolutions of the Board of Directors of Transcounties, authorizing the execution of the guarantee note, were passed January 2, 1941, and the guarantee note executed by Transcounties is dated January 2, 1941. The supplemental instruction sheet was signed by the trustees and the officers of Transcounties on January 2, 1941. The guarantee note was forwarded to the bank on January 2, 1941, and received by the bank on January 4, 1941. C. S. Chapman, who conducted the negotiations concerning the terms of the guarantee note to be executed by Transcounties with Toll of the bank, was the president of Transcounties; and he and the other directors, Charles C. Chapman, his father and Sam Collins all lived together and the matter of the terms of the note were discussed informally among the directors while the negotiations were in progress. On January 4, 1941, the escrow holder instructed *255 the title guarantee company to record the deed and make delivery of the deed, which had previously been delivered to the title company. The deed was recorded on January 7, 1941, and delivered to Stark for the purchaser shortly thereafter. On August 31, 1940, the board of directors of Transcounties adopted a resolution reading as follows: "WHEREAS, this corporation has a paid in or contributed capital surplus as of August 31, 1940 of $679,694.30 and "WHEREAS, it has an earned surplus deficit of $135,775.57 as of August 31, 1940, and "WHEREAS, the company has a stated capital of only $10,965.00, and it is desired at this time to increase said stated capital, "NOW, THEREFORE, BE IT RESOLVED, That there will be transferred from the paid in surplus account of this corporation to its stated capital account the sum of $18,355.77, and that the Secretary-Treasurer be and he is hereby authorized and instructed to make the necessary and proper entries on the books of this corporation." On October 1, 1940, the board of directors of Transcounties adopted a resolution declaring a dividend in kind by distributing (1) the note receivable from the Charles C. and S. J. Chapman Company, in *256 the amount of $60,000, (2) the Lindsay Ranch properties, and (3) El Dorado Ranch properties. The stockholders of Transcounties on November 8, 1940, organized "The El Dorado Trust," for the purpose of receiving the dividend in kind declared by Transcounties on October 1, 1940. It was believed easier to handle the transaction with two trustees acting for all the stockholders. The interests in The El Dorado Trust were owned in exactly the same proportion as the stock in Transcounties. Transcounties, by grant deed dated November 8, 1940, which was recorded November 18, 1940, transferred the Lindsay Ranch to The El Dorado Trust and by grant deed dated November 8, 1940, which was recorded November 16, 1940, transferred the El Dorado Ranch to The El Dorado Trust. The El Dorado Trust held the Lindsay Ranch until transferred to Stark and Waddell, Inc., under the circumstances set forth above. In November, 1940, the trustees of The El Dorado Trust engaged a civil engineer, who began preliminary surveys of The El Dorado property for subdivision. It is stipulated that Transcounties began the year 1940 with an operating deficit of $151,191.34. It had a net loss of $39,391.78 during 1940. *257 The 1940 net value of the properties distributed to the stockholders in that year was $177,444.43. The net book cost of these properties to Transcounties was $18,355.77. Opinion Respondent's basic position, that the disposition of the Lindsay Ranch resulted in capital gain to the corporate petitioner, [1] is moot unless it is established that for tax purposes the sale was made in 1940. That is the only year before us. A similar relationship of issues appeared in , in which it was held on the evidence there that the sale took place in the year following the taxable year. A consideration of the facts in the present case leads us to a similar conclusion. Although a substantial portion of the requirements under the various escrow agreements had been satisfied, the whole remained nonetheless conditional. An essential part of the transaction was the guarantee by Transcounties on a promissory note for $40,000 given by the trustees. This was not submitted to Transcounties, formerly acted upon by that corporation, executed by it, nor delivered to the escrow agent until January, *258 1941. Nor were the escrow conditions regarded as satisfied until January, 1941, after which the deeds were delivered and recorded. Without these final transactions, whatever had been accomplished in 1940 would have been ineffective. Even if equitable title had passed, which is doubtful, that would not be enough. , affirmed . We conclude that no sale took place in 1940, and that respondent's position based upon such a premise is without merit. It follows, as in , that consideration of the application of the principle of , is eliminated. The alternative contention that the corporate petitioner realized taxable income through distribution of property which had increased in value is foreclosed by the authorities. . And the stipulated facts that petitioner had no accumulated earnings before or after the transaction deprive this record of facts upon which to urge that the distribution of enhanced assets made good the deficit in earned surplus, thus *259 constituting a distribution of accumulated earnings, even if such a contention were otherwise possible. See , affirmed (C.C.A., 6th Cir.), . Decisions will be entered under Rule 50. Footnotes
1. See .↩